Matter of Riel v State of N.Y. Off. of Children & Family Servs. (2019 NY Slip Op 06575)





Matter of Riel v State of N.Y. Off. of Children & Family Servs.


2019 NY Slip Op 06575


Decided on September 17, 2019


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 17, 2019

Sweeny, J.P., Manzanet-Daniels, Webber, Gesmer, Kern, JJ.


9842 451416/18

[*1]In re Joanne B. Riel, Petitioner-Appellant,
v
The State of New York Office of Children and Family Services, et al., Respondents-Respondents.


Janet Sabel, The Legal Aid Society, New York (Karen Cacace of counsel), for appellant.
Letitia James, Attorney General, New York (Blair J. Greenwald of counsel), for respondents.



Determination of respondent New York State Office of Children and Family Services, dated March 27, 2018, which, after a hearing, revoked petitioner's license to operate a family day care home, confirmed, the petition denied, and the proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of Supreme Court, New York County [W. Franc Perry, J.], entered January 17, 2019), dismissed, without costs.
The facts are essentially set forth in the dissent and will not be referenced here except where necessary for clarification or amplification.
The first issue to be decided is whether the agency's decision is supported by substantial evidence.
A court's review of an agency determination made after an administrative hearing is limited to whether the challenged determination is supported by substantial evidence (Matter of O'Rourke v Kirby, 54 NY2d 8, 14 [1981]). A reviewing court must defer "to the fact-finding and credibility determinations of the agency" (Matter of Nelke v Department of Motor Vehs. of the State of N.Y., 79 AD3d 433, 434 [1st Dept 2010]). The "substantial [evidence] threshold" is met by the existence of "some credible evidence" (Matter of Borenstein v New York City Employees' Retirement Sys., 88 NY2d 756, 760 [1996][internal quotation marks omitted]).
Respondent Office of Children and Family Services (OCFS) is tasked by statute and regulation with supervision of day care providers. To ensure that children in day care are adequately supervised, OCFS "may make announced or unannounced inspections of the records and premises of any child daycare provider, whether or not such provider has a license from, or is registered with, [OCFS]" (Social Services Law § 390[3][a]). OCFS has the authority to temporarily suspend a day care provider's registration without a hearing based on a finding that the provider prevented OCFS from effectively assessing whether the public health, or an individual's safety or welfare, is in imminent danger by refusing to provide inspectors with access to the child day care program, premises or children during the program's hours of operation (18 NYCRR 413.5[a][3][i]).
There are two different legal determinations and standards between a license suspension and revocation. For a temporary suspension, there must be a finding of "imminent danger" as noted above. For a license revocation, the applicable standard is set out in Social Services Law § 390(10): "Any violation of applicable statues or regulations shall be a basis to deny, limit, suspend, revoke, or terminate a license of registration."
Petitioner does not contest her suspension and thus the "imminent danger" standard does not apply. That leaves us to consider whether there was substantial evidence to support the agency's determination to revoke petitioner's registration.
18 NYCRR 417.15(b)(10)(i) and 417.15 (b)(10(ii) require petitioner to give the inspector free access to the day care, the children, and program records and to cooperate with the inspector during the inspection. The inspection conducted on February 9, 2018 was conducted on a day [*2]and during the hours of operation listed in petitioner's registration. There is no question that petitioner repeatedly asked Inspector Richards to leave, even though there were two children and two adults on site at that time, during the listed hours of operation. It is also uncontroverted that Richards remained in the entryway the entire hour she was on site and was not permitted to enter any other room that formed part of the day care premises. Although petitioner did give Richards a folder with documents upon request, the first document was a blank sign-in sheet, despite there being children and adults present inside the day care.
Petitioner contends that because a "Mommy and Me" program was being conducted during the listed hours of operation, Richards' inspection was inappropriate because no "day care" services were being provided at that time and thus, the regulations do not apply. This argument fails on several levels.
First, if petitioner's argument is accepted, it would undermine the purpose of the inspection requirement in the regulations. Any provider who is in violation of any regulation can simply claim to any inspector that it is not conducting "day care" at the time of the inspection, thus undermining the child-protective purposes of the inspection regulations.
Second, such an interpretation shifts the burden of determining whether a day care is operating, and which program is being performed at the time of an inspection, to the inspector. To the contrary, by using the stated operating hours as listed in the registration, there can be no question that whatever program is being performed during those hours, compliance with 417.15 is mandated. It must be kept in mind that it is the provider who determines what program it will run at a particular time. By making any program run during the hours of operation set forth in the registration certificate subject to the inspection provisions of the regulations, there is certainty to both the agency inspectors and providers as to the applicability of the inspection provisions of the regulations. Such an approach does not add any additional burdens to providers.
In sum, we conclude that substantial evidence supports respondent's findings that petitioner violated relevant regulations regarding the management and administration of her family day care home. The record clearly shows that petitioner failed to admit an inspector onto the premises to complete an inspection (18 NYCRR 417.15 [b][10][i]), failed to cooperate with the inspector (18 NYCRR 417.15 [b][10][ii]), and failed to operate in compliance with day care laws and regulations (18 NYCRR 417.15 [a][1][ii]; see Clarke v New York State Off. of Children & Family Servs., 91 AD3d 489 [1st Dept 2012]). Contrary to petitioner's contention, she did not properly notify respondent of any changes to her day care program operating hours.
We now turn to the question as to whether the penalty of revocation is fair and proportionate.
An administrative determination should be set aside "only if the measure of punishment or discipline imposed is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness" (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 233 [1974][internal quotation marks omitted]). "Shocking to one's sense of fairness" is, of course, a "purely subjective" standard. Nevertheless, it can be said that "a result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct" (id., at 234).
We lack any discretionary authority or interest of justice jurisdiction in reviewing the penalty imposed by OCFS, and annulment and remittal to the agency for reconsideration of the revocation would be appropriate only if the penalty violated the rigorous Pell standard (see Matter of Featherstone v Franco, 95 NY2d 550, 554 [2000]).
We find that the penalty imposed here does not meet the Pell standard and does not shock our sense of fairness (see Matter of Unity Home Care Agency, Inc. v New York State Dept. of Health, 171 AD3d 419, 420 [1st Dept 2019]; Simpson v New York State Off. of Children & Family Servs., 93 AD3d 588 [1st Dept 2012]).
The dissent posits that our decision in Unity is distinguishable from the instant case and does not support our conclusion. While the facts in Unity are different and the violations more egregious than here, the standard of review of the penalty imposed remains the same, i.e. a challenge to the penalty imposed must meet the Pell standard. Here, it is not met.
Both petitioner and our dissenting colleague rely heavily on Matter of Grady v New York State Off. of Children & Family Servs. (39 AD3d 1157 [4th Dept 2007]). In Grady the Court found the penalty of license revocation was "shocking to one's sense of fairness." The violations there involved two instances of overenrollment of children on separate days and the failure to maintain proper attendance records. Both cases of overenrollment occurred through no fault of the petitioner and were beyond her control. In one case, the overenrollment resulted from an unanticipated school early release, and the other involved a child being dropped off at day care after petitioner was advised that the child would not be attending that day. The petitioner immediately took action to reduce the overenrollment by contacting the parents to pick up the children dropped off there from the early release. The Grady Court also found that revocation would deprive both petitioner and her assistant of their livelihood, the day care being their only source of income. That is not the case here, as will be discussed infra. The only similarity to this case is the fact that in both cases, community letters of support were submitted on behalf of petitioners. Notably, the ALJ in this case had these letters before her and they were presumably taken into consideration in arriving at her determination.
Our facts are quite different. Petitioner herself created the situation that caused the violations by unilaterally changing her hours of operation without properly advising OCFS and failing to maintain proper records. When Inspector Richards appeared during the hours of operation listed on petitioner's certificate, she was within her regulatory obligation to conduct an inspection at that time, especially since children and adults were on the premises, a program was actually in progress and she had been handed a blank sign-in sheet. It is of no significance that the "Mommy and Me" program does not have the same requirements as a day care program, because it was being conducted during the hours listed for day care on petitioner's registration. To hold otherwise would defeat the entire purpose of the inspection requirements, as we noted above.
There is no question that petitioner repeatedly asked Richards to leave and come back later. It does her no credit to lay the blame on the parent who admittedly escalated the standoff and created a hostile situation for Richards by demanding identification, videotaping Richards by holding her cell phone approximately a foot from Richards's face and telling her to leave in a "strong" voice. During this confrontation, petitioner did nothing to defuse the situation. In fact, she continued to ask Richards to leave and come back later.
The fact that Richards was on the premises for approximately one hour is of no moment, and does not, as our dissenting colleague argues, constitute cooperation with the inspection. It is uncontroverted that Richards remained in the entranceway to the apartment and was not permitted to complete her inspection of the premises as required by regulation.
On the issue of deprivation of livelihood, unlike Grady, this is not petitioner's sole or even major source of income. In fact, petitioner, in a letter to the Department of Health stated that she was mostly a music and movement teacher, that she essentially worked as a music teacher and taught "Mommy and Me" classes from her day care space. Petitioner testified at her hearing that the play group was "a very part-time enterprise," later repeating that "I have a very, very part-time daycare program." Petitioner cannot have it both ways. To now argue that revocation is an overly harsh penalty because it would deprive her of her main source of income simply does not comport with the facts.
In short, we see no reason to disturb the penalty imposed.
We have considered petitioner's remaining arguments and find them unavailing.
All concur except Gesmer, J. who dissents in a memorandum as follows:




GESMER, J. (dissenting)


I agree with the majority that substantial evidence supports the Administrative Law Judge's (ALJ) finding that petitioner violated applicable regulations by failing to fully cooperate with the inspection (18 NYCRR 417.15[b][10][i], [ii]). Indeed, petitioner does not contest that finding. However, I would find that the revocation of her day care registration is unduly harsh, [*3]particularly given that she had provided nurturing and loving services to children in her community for many years, revocation would deprive her of a good portion of her livelihood, and the lives of the families who relied on her for day care would be disrupted (see Matter of Grady v New York State Off. of Children & Family Servs., 39 AD3d 1157 [4th Dept 2007]). Accordingly, I would remand the matter to respondent for further proceedings to determine a more appropriate penalty.
Under the Social Services Law, family day care homes must be registered with respondent New York State Office of Children and Family Services (OCFS) (Social Services Law § 390[2][b]). These programs are subject to annual inspection (Social Services Law § 390[4][a]), and to "announced or unannounced inspections of the records and premises" (Social Services Law § 390[3][a]). "Any violation of applicable statutes or regulations shall be a basis to deny, limit, suspend, revoke, or terminate a license or registration" (Social Services Law § 390[10]). In New York City, the New York City Department of Health and Mental Hygiene (DOH) childcare division administers day care registration pursuant to contract (see McLean v City of New York, 12 NY3d 194, 197 [2009]).
Petitioner Joanne B. Riel owned and operated a family day care program in her home, which was registered with respondent OCFS for a four-year period commencing October 18, 2015. In her application, she listed the hours of operation of her day care program as 9:00 a.m. to 2:00 p.m. on Tuesdays, Wednesdays and Fridays. In addition, petitioner taught music and operated a "mommy and me" playgroup in her home. It is undisputed that the latter two activities are not required to be registered or licensed.
On February 9, 2018, an inspector came to petitioner's apartment to conduct an annual inspection and to determine whether she had cured violations identified in a January 22, 2018 letter to petitioner from the DOH [FN1]. Petitioner advised the inspector that she was in the middle of a playgroup with two children and their caregivers, and asked if the inspector could come back at another time to conduct the day care inspection. Nevertheless, she let the inspector into her apartment. The inspector stood in the entrance of the playspace, where she observed two children and two adults, in addition to petitioner. The inspector watched the children participate in a music activity with petitioner and their caregivers for about 15 minutes, and observed that the children seemed happy. Petitioner asked the inspector several times to come back at a later time after she was finished with her "mommy and me" music class [FN2]. The inspector asked to see [*4]petitioner's visitor's log, and petitioner handed it to her,[FN3] stapled to the top of a folder, which petitioner testified contained her other day care records.
At that point, one of the two adults interrupted, identified herself as a parent, and began videotaping the inspector with her cell phone. The inspector then called her supervisor. When she made the call, the parent stopped videotaping her, and petitioner escorted both caretakers and the children to another part of the apartment, away from the inspector. The supervisor told the inspector to leave without completing the inspection, and she did so.
In all, the inspector was in petitioner's home for an hour. The inspector testified that it was the parent, not petitioner, who interrupted the inspection and created a "hostile situation" by videotaping her and speaking to her in a "strong volume." She also testified that she was not aware at the time of the inspection that petitioner ran a "mommy and me" playgroup that was not required to be registered or licensed by OCFS, and that she did not understand why petitioner had asked her to come back at another time.
By letter dated February 9, 2018, OCFS notified petitioner that her registration was suspended and that they would seek to revoke it, because she failed to cooperate with the inspection that day [FN4]. Petitioner requested a hearing, which was held on March 9, 2018.
By decision dated March 27, 2018, the ALJ determined that petitioner had failed to cooperate with the inspector and provide her with free access to the premises during the hours of day care operation listed in petitioner's application, that she failed to operate in compliance with applicable statutes and regulations because she had not advised OCFS in writing of a reduction in the hours of operation of her day care services,[FN5] and that, therefore, OCFS properly revoked her registration.
Petitioner then commenced the article 78 proceeding in Supreme Court, which transferred the petition to this Court pursuant to CPLR 7804(g).
Although petitioner's "mommy and me" playgroup is not subject to OCFS oversight, the inspector was entitled to rely on the day care operating hours which petitioner had listed on her application, and petitioner was obligated under the Social Services Law to provide the inspector with "free access to the building, the caregivers, employees and volunteers, the children and any program records" during those times and to cooperate with the inspection (18 NYCRR 417.15[b][10][i], [ii]). However, in my view, the circumstances of this case do not justify revocation for four reasons.
First, petitioner did cooperate with the inspection by admitting the inspector into her apartment, permitting the inspector to remain for an hour and to observe the playgroup, and by [*5]handing the inspector the day care documents she understood the inspector to have requested. Indeed, the inspector testified clearly that it was a parent who interrupted her interaction with petitioner, prevented her from looking at any of petitioner's day care records beyond the visitor's log on the top of the folder, and created a "hostile situation" by videotaping her and demanding that she identify herself. I disagree with the majority's statements that petitioner did not permit the inspector to enter other rooms in her apartment or otherwise prevented the inspection from taking place. The inspector testified that she did not leave the entryway because it was her policy to stay by the door in the winter, unless she had plastic bags covering her shoes. She testified that petitioner asked her to "please" come back at another time to complete the inspection. When the inspector asked if petitioner was "obstructing" her, petitioner invited her in. Moreover, while the majority states that petitioner "did nothing to defuse the situation" after the parent interrupted, the inspector testified that petitioner took the children and adults to another part of the apartment after the parent interrupted the inspection.
Second, this case is not at all like the circumstances in Matter of Unity Home Care Agency, Inc. v New York State Dept. of Health (171 AD3d 419, 420 [1st Dept 2019]), cited by the majority. There, DOH was prevented from inspecting on four separate occasions between 2009 and 2015, with the result that it was unable to monitor the agency's operations at all for six years.
Third, petitioner presented six extremely enthusiastic letters of support at the hearing, attesting to petitioner's nurturing care for their children. The ALJ found that the parents of children attending her programs are "extremely pleased" with her care of their children. These letters demonstrate that she has provided a valuable service to families in her community for many years, and that those families' lives would be disrupted, and petitioner's livelihood diminished, by revocation of her license (see Matter of Grady, 39 AD3d at 1159 [reversing revocation of day care registration based on these facts]).
Finally, petitioner does not challenge the ALJ's findings that she failed to fully cooperate with the inspection. Rather, she only seeks imposition of a less harsh penalty. This indicates that she understands the seriousness of her conduct.
Under these circumstances, there is no "grave moral turpitude" or "grave injury to the agency involved or to the public weal," and it is appropriate for this Court to ameliorate the overly harsh sanction of revocation of petitioner's registration (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 235 [1974]; see also Matter of Grady, 39 AD3d at 1158-1159).
Accordingly, I would vote to remand the matter for imposition of a lesser sanction.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: SEPTEMBER 17, 2019
CLERK



Footnotes

Footnote 1:The inspector testified that four items are required during an on site follow-up inspection: confirmation that (1) the visitor's log, (2) attendance records, and (3) emergency medical treatment consent forms for specific children were maintained on site; and (4) that monthly fire drills were conducted. She testified that the balance of the items in the letter could be addressed by petitioner's submission of documents by mail, which she had done when she completed and returned the corrective action plan form attached to DOH's letter.

Footnote 2:The same inspector had come to her home approximately two weeks earlier, on Wednesday, January 24, 2019 in the afternoon. Petitioner explained that her day care was in operation on Wednesday mornings from 9:30 to 11:30 a.m., and asked that the inspector come back on a Wednesday during those hours to inspect the day care program while it was in operation. After confirming that no children were present that day, the inspector left. Petitioner testified that she returned a call from the inspector's supervisor on January 24, 2018, and left him a message with the same information.

Footnote 3:The majority implies that the blank visitor sheets indicated a violation. However, applicable regulations require that any visitor to a family day care center who is not "a day care child, staff person, caregiver, volunteer, household member, employee, parent of a child in care, or person authorized to pick up or drop off a child to the day care program" to sign in upon entry (18 NYCRR 413.2[c][14], 417.8[p]). As petitioner testified, because she had had no visitors as defined by the regulations, the log book contained no signatures.

Footnote 4:Petitioner does not challenge the suspension. Accordingly, as the majority concedes, the suspension, and the ALJ's finding of "imminent danger" justifying it, are not before us (18 NYCRR 413.5[a][3][i]).

Footnote 5:In fact, the ALJ did not cite to any regulation requiring a day care operator to advise the agency of any decrease in day care hours (cf. 18 NYCRR 417.15[b][2] and [3] [requiring registrant to obtain written approval before increasing hours of operation]).